IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

01 JUL 19 AM 10: 36

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| CHARLES E. MILLAR, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV-00-H-1547-W |
| STILLMAN COLLEGE, | ) | |
| DEFENDANT. | ) | |

**ENTERED**

JUL 1 9 2001

## MEMORANDUM OF DECISION

The Court has before it the May 2, 2001 motion of defendant Stillman College for summary judgment.  Pursuant to the Court's May 3, 2001 order as amended May 15, 2201 and May 25, 2001, the motion was deemed submitted, without oral argument, on June 22, 2001.[1]

---

[1] Pursuant to the court's May 3, 2001 order, the motion for summary judgment was to be under submission as of May 31, 2001. On May 15, 2001, the court granted defendant's motion for leave to file a reply brief by June 7, 2001.  On May 25, 2001, the court granted plaintiff's unopposed motion for extension of time to file his responsive brief to the summary judgment motion, thereby extending the time for plaintiff to file a brief in opposition to summary judgment to June 15, 2001 and the time for defendant to file a reply brief to June 22, 2001.  Although defendant suggests in its reply brief that plaintiff's June 15, 2001 evidentiary submission was untimely, the court notes that the May 25, 2001 extension of time for plaintiff to file his responsive brief also effectively extended the time for plaintiff to file his evidentiary submission in opposition to summary judgment.  Thus, plaintiff's June 15, 2001 evidentiary submission was timely.



### I. Procedural History

Plaintiff Charles Millar commenced this action on June 5, 2000 by filing a complaint in this court alleging liability on the part of his employer for allegedly terminating plaintiff because of his race (white) and age (mid-seventies).  (See Compl. ¶ 6.)  In his complaint, plaintiff contended that defendant's alleged conduct constituted a violation of Title VII, 42 U.S.C. §§ 2000e, et. seq.; the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621, et. seq.; and the Alabama Age Discrimination in Employment Act, Ala. Code § 25-1-20, et. seq.[2] (See Compl. ¶¶ 1, 30-70.)  Defendant filed an answer on July 17, 2000.  (See Def.'s Answer.)  Under the August 23, 2000 order, the deadline for filing dispositive motions was fixed as May 2, 2001.  Defendant's May 2, 2001  motion for summary judgment asserts that no genuine issue of material fact exists and that Stillman College is entitled to judgment as a matter of law.  (See Def.'s Mot. Summ. J.)

The parties have each filed briefs and submitted evidence in

---

[2] The court notes that, although plaintiff alleges four separate counts in his complaint, counts two and three are essentially the same:  Count I alleges age discrimination under the ADEA; Count II alleges racial discrimination under Title VII; Count III alleges disparate treatment under Title VII; and Count IV alleges age discrimination under Alabama's ADEA. (See Compl. ¶¶ 30-70.)

support of their respective positions concerning the pending motion for summary judgment.  On May 10, 2001, defendant submitted evidence[3] in support of the motion and on May 17, 2001, defendant filed a supporting memorandum of law.  Plaintiff submitted evidence[4] in opposition to the motion and filed an opposing brief on June 15, 2001.  On June 22, 2001, defendant filed a reply brief.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for

---

[3] Defendant submitted the March 15, 2001 deposition of Charles E. Millar; exhibits to the March 15, 2001 deposition of Charles E. Millar; the April 11, 2001 declaration of Phyllis Jones with exhibits; and the April 30, 2001 declaration of Myrtes D. Green with exhibits.

[4] Plaintiff submitted the June 14, 2001 affidavit of Dr. Charles E. Millar; the June 13, 2001 affidavit of David Lawson; the April 20, 2001 affidavit of Dr. Rose Marie Stutts; the September 19, 2000 EEOC Charge of Discrimination of Larry Kincaid; and various correspondence regarding Margaret McCain's employment with Stillman College.

its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)). If the

4

moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

    If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

    The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's

claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[5]

Plaintiff is white, was born on September 11, 1924, and was in his early to mid-seventies during the relevant time period for this action.  (See Dep. of Charles Millar 11.)  He worked for defendant Stillman College during two separate periods: September 1, 1963 through May 15, 1982 and again August 1991

---

[5] If facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 2 F.3d at 1115.

through July 1999. (See id. at 12-13, 36-37, 108; Ex. 5 to Dep.
of Charles Millar.)  During his first period of employment at
Stillman College, plaintiff was awarded tenure in 1972 as a
professor in the college's education department. (See id. at 19;
Ex. 1 to Dep. of Charles Millar.)  In May of 1982, plaintiff
resigned his employment, without grant of an official leave of
absence, to pursue personal and business interests.  (See id. at
23-28; Exs. 3-5 to Dep. of Charles Millar.)  In July of 1990,
plaintiff applied for employment at Stillman and returned as a
professor in the education department in August of 1991.  (See
id. at 30-32, 36-37; Ex. 6 to Dep. of Charles Millar.)  Plaintiff
believed that he returned to the faculty at Stillman College in
August of 1991 as a tenured professor, based on his rank as
"professor" and the language contained in an addendum to the
annual employment contracts which stated, "Tenure is based on
policy adopted by the Board of Trustees."  (See id. at 37-38.)
Plaintiff also notes that in 1996, plaintiff indicated on a
faculty information sheet that he was tenured and that
information was never corrected by the administration.[6]  (See id.

_____

[6] Defendant strongly contests plaintiff's status as a
tenured professor when he returned to Stillman in 1991.
Defendant relies upon the testimony of Dr. Myrtes Green , Dean of
Stillman's Education Department, that plaintiff returned to
Stillman as an untenured faculty member, (see Green Decl. ¶ 3),
and the fact that plaintiff received annual contracts of

7

at 41-43; Ex. 8 to Dep. of Charles Millar.)  Plaintiff was

offered annual employment contracts for each academic year in

which he taught during the period of August of 1993 through May

of 1998. (See id. at 38-40; Ex. 8 to Dep. of Charles Millar.)

Defendant's Faculty Handbook provides that at least one

year's notice will be given to a faculty member if that faculty

member is to be terminated for reasons other than cause and has

more than eighteen months of service at Stillman College.  (See

Green Decl. ¶ 12; Ex. C. to Declaration of Myrtes Green.)  The

notice requirement applies to all faculty members with more than

eighteen months of service, regardless of tenure status.  (See

id.)

By letter dated April 27, 1998, the president of Stillman

College, Dr. Earnest McNealy, a black male, informed plaintiff

that plaintiff's annual employment contract would not be renewed

following the conclusion of the 1998-1999 academic year.[7]  (See

_____

employment for each academic year in which he taught, (see Dep.
of Charles Millar 38-40; Ex. 8 to Dep. of Charles Millar).

[7] Defendant states that the decision not to renew
plaintiff's employment contract was made based on the
recommendation of Dr. Myrtes Green, the Dean of Education at
Stillman.  (See Green Decl. ¶ 10.)  Dr. Green stated that the
recommendation was based on negative student evaluations as well
as plaintiff's inadequate qualifications under both the Southern
Association of Colleges and Schools and the Alabama State
Department of Education guidelines, which were integral to
accreditation of the education department at Stillman.  (See id.
at ¶¶ 4-10.)

Dep. of Charles Millar 44; Ex. 9 to Dep. of Charles Millar.)
Thus, the final employment period according to the last annual
employment contract offered to plaintiff was August 12, 1998
through May 11, 1999.  (See Ex. 9 to Dep. of Charles Millar.)
Plaintiff admits having received the letter from Dr. McNealy in
the spring of 1998.  (See Dep. of Charles Millar 52.)  Plaintiff
first testified that when he received the non-renewal letter from
Dr. McNealy in the spring of 1998, he felt like he had been
discriminated against based on his age and race. (See id. at 53-
54.)  At that time, plaintiff was the oldest faculty member in
the education department at Stillman.  (See id. at 102.)  Later
in his testimony, however, plaintiff stated that when he received
the non-renewal letter, he felt that he had been discriminated
against based on his age, but it was not until later, when a
black male replacement (Dr. Anthony Nzeocha) was chosen to teach
some of the courses which plaintiff had previously taught, that
plaintiff felt discriminated against because of his race.[8] (See

_____

[8] Plaintiff testified that, on a course schedule released in
the spring of 1999, Dr. Nzeocha's name was listed as the
designated fall 1999 teacher of one of the courses that plaintiff
had previously taught; however, plaintiff stated that he did not
know at that time that Dr. Nzeocha was going to teach plaintiff's
courses.  (See Dep. of Charles Millar 137-139.)  Plaintiff
admitted that he knew the courses he had previously taught would
still be offered after plaintiff's employment at Stillman was
terminated, but plaintiff testified at one point during his
deposition that the course schedules he received did not specify

id. at 56-58.)  Plaintiff stated that Dr. Nzeocha was a member of
the education department faculty prior to the non-renewal
decision in the spring of 1998. (See id. at 48.)  Plaintiff also
testified that prior to the spring of 1998, Dr. Nzeocha had taken
over an introductory course that plaintiff taught, but plaintiff
did not consider Dr. Nzeocha's teaching of that introductory
class to be discriminatory because plaintiff was teaching a full
course load at the time.  (See id. at 47-49.)

     Plaintiff also testified that he felt discriminated against
during his last year at Stillman College because "[o]ther faulty
members were given computers, printers . . . [while plaintiff]
had to buy [his] own.  And [plaintiff] was not able to purchase
any audio-visual material, and [plaintiff] had to buy [his] own
audio-visual material." (See id. at 61.)  Plaintiff testified
that he considered not providing him with a computer and printer
to be race and age discrimination, but also stated that he could
have been overlooked for the equipment because plaintiff had been

_____

who would teach those courses.  (See id. at 100-101.)  Plaintiff
testified that it was not until Dr. Nzeocha asked to borrow some
of plaintiff's videotapes in the summer of 1999 that plaintiff
was led to believe that Dr. Nzeocha would be teaching plaintiff's
courses.  (See id.)
     Plaintiff also alleged in his deposition and in his
complaint that a young black female, whose name plaintiff does
not know, also was hired to teach courses previously taught by
plaintiff. (See id. at 143-144; Ex. 23 to Dep. of Charles
Millar.)

10

terminated and "they felt no need to provide me with it." (<u>See</u> <u>id.</u> at 111.)  Plaintiff could not recall exactly who else received a computer and printer in his department, but he testified that he believes that a black woman in his department(whose name plaintiff cannot recall) and the chairman of his department received a computer and printer while he did not and that other professors (whose names plaintiff cannot state and whose races plaintiff did not mention in his deposition) received audio-visual materials while plaintiff did not.[9]  (<u>See</u> <u>id.</u> at 110-113, 64-66.)  Plaintiff also alleged that he was subjected to discriminatory conduct because Dr. Mackin "intentionally avoided him" on numerous occasions beginning when Dr. Mackin arrived on campus in 1998.  (<u>See</u> <u>id.</u> at 116-119.) Plaintiff testified, however, that Dr. Mackin's behavior could have been potential age discrimination or could have been

---

[9] Plaintiff's brief in opposition to summary judgment represents to the court that "[b]lack faculty members were given computers and printers, however Dr. Millar and Dr. Ford, both white, were not afforded computers," and that "Dr. Millar made a request for audio visual materials and was told there was no money available for materials even though other black professors were provided audio visual materials." (See Pl.'s Mem. Opp'n Summ. J. 7.)  An examination of the pages cited by plaintiff' brief reveals, however, that plaintiff's brief grossly overstates plaintiff's actual sworn testimony of the events.  The court was appalled to find that plaintiff's brief is replete with such exaggerations that, upon an examination of plaintiff's deposition, are obviously misrepresentations of the facts in question.

"indicative of [plaintiff] being terminated."[10]   (See id. at 117-118.)   Plaintiff testified that Dr. Mackin (white) made the statement that it was deplorable that only forty percent of the faculty was African-American, and plaintiff considered that statement to be discriminatory; plaintiff cannot recall when that statement was made.  (See id. at 126-130.)  Plaintiff also stated that Dr. McNealy remarked in a faculty meeting that he would like a faculty that was "much closer in age to the students" and that "looked like him but younger." (See id. at 119-125.)  Plaintiff stated that he could not recall the date when that statement was made or who else was present when the statement was made, but he testified that he considered that statement to be discriminatory because Dr. McNealy was younger than plaintiff and black.  (See id.)  Plaintiff testified that he did not believe that any of the above statements made by Dr. Mackin and Dr. McNealy were directed towards him or aimed to discriminate against plaintiff specifically.  (See id. at 122-129.)

Although plaintiff's employment contract ended on May 11, 1999, plaintiff requested and received permission from Dr. McNealy to teach two courses during the summer of 1999 on a non-

---

[10] With respect to whether any of these events were because of discrimination or because plaintiff had been terminated, plaintiff states that he "can't separate one from the other." (See id. at 117.)

12

contract basis.[11]  (<u>See</u> <u>id.</u> at 51-52.)

Defendant maintains policies that prohibit discrimination in the workplace and since at least 1996, has displayed notices in its business office regarding equal employment opportunity laws, including Title VII and the ADEA.  (<u>See</u> Jones Decl. ¶ 3-4; Ex. A to Declaration of Phyllis Jones.)  Plaintiff testified that he was aware that there were federal laws which prohibited age and race discrimination in the workplace, although plaintiff claims he did not have knowledge of the "scope" of those laws until 1999.  (<u>See</u> Dep. of Charles Millar 13-17.)

Plaintiff testified that defendant gave him no reason for the non-renewal decision and plaintiff made no inquiry as to why his contract was not renewed when he was given notice in the spring of 1998. (<u>See</u> <u>id.</u> at 66, 70-73.)  353 days after the date of the non-renewal letter, plaintiff first inquired about the

─────────────────

[11] In plaintiff's brief in opposition to summary judgment, plaintiff misrepresented to the court that Stillman College had asked plaintiff to teach classes during the summer. (See Pl.'s Mem. Opp'n Summ. J. 4, 12.)  Plaintiff even goes so far to suggest that the termination letter sent to plaintiff was "voided" by Stillman's hiring of plaintiff to teach two courses in the Summer of 1999. (See Pl.'s Mem. Opp'n Summ. J. 12.)  In plaintiff's deposition, however, when asked who made arrangements for him to teach in the summer of 1999, plaintiff replied, "I asked the division chairman--I mean Dr. Green, I believe she---anyway, Dr. McNealy said I could.  Yeah, I did ask Dr. Green, and she later told me that Dr. Mac [sic] had said I could teach that summer."  (See Dep. of Charles Millar 52.)

reasons for his non-renewal in a letter to President McNealy dated April 15, 1999.  (See id. at 71-73; Ex. 10 to Dep. of Charles Millar.)  Plaintiff testified that he waited almost a year to appeal the decision because he "didn't know what to do." (See id. at 70.) President McNealy responded by letter dated April 22, 1999 that he could not answer plaintiff's questions because he did not play an active role in the decision.  (See Ex. 11 to Dep. of Charles Millar.)  On April 30, 1999, plaintiff wrote Dr. James Mackin, Vice-President of Academic Affairs at Stillman College, and Dr. Linda Dover, Faculty Committee Chairperson at Stillman College, regarding his non-renewal decision.  (See Exs. 12-13 to Dep. of Charles Millar.)

By letter dated May 7, 1999, Dr. Dover acknowledged receipt of plaintiff's non-renewal complaint and informed plaintiff that the faculty committee would expedite review.  (See Ex. 14 to Dep. of Charles Millar.)  On May 19, 1999, plaintiff, in a letter to Dr. Dover, attached pertinent documents and outlined his arguments for overturning the non-renewal decision, including the issue of tenure but not mentioning discrimination.  (See Ex. 15 to Dep. of Charles Millar.)  By letter dated May 26, 1999, Dr. Dover requested further documentation from plaintiff and noted that while plaintiff was granted a full professorship in 1971, plaintiff was identified as "non-tenured faculty" in the April

14

22, 1999 letter from Dr. McNealy.  (See Ex. 16 to Dep. of Charles
Millar.)  Dr. Dover referenced a page of the Faculty Policy
Manual which states that "Faculty holding tenure will not lose
tenure if granted an official leave of absence," and informed
plaintiff that if he intended to argue that he indeed had tenure,
plaintiff must provide evidence that he obtained an official
leave of absence when he left Stillman College in May of 1982.
(See id.)  On June 2, 1999, Dr. Dover again requested additional
documentation from plaintiff, (see Ex. 17 to Dep. of Charles
Millar), but plaintiff never provided any documentation
supporting his alleged tenure status, (see Dep. of Charles Millar
82).  On July 8, 1999, Dr. Dover informed plaintiff by letter of
the committee's conclusion that plaintiff had received proper
notice of the non-renewal decision and Dr. Dover invited
plaintiff to submit a written appeal to President McNealy if
plaintiff was unsatisfied with the committee's conclusions.  (See
Ex. 18 to Dep. of Charles Millar.)

     On August 3, 1999, an attorney representing plaintiff wrote
President McNealy a letter raising allegations of age
discrimination and indicating that plaintiff would file a charge
of discrimination with the EEOC.  (See Ex. 19 to Dep. of Charles
Millar.)  On September 13, 1999, plaintiff filed a charge of
discrimination with the EEOC alleging that, because of

plaintiff's race and age, he was terminated and "not afforded the procedural safeguards associated with the termination of a tenured employee." (Ex. 20 to Dep. of Charles Millar.) Plaintiff's EEOC charge was filed 504 days after the date of President McNealy's initial letter to plaintiff informing him of defendant's decision to terminate plaintiff's employment and not renew his contract. (See Ex. 9, 20 to Dep. of Charles Millar.)

Plaintiff filed his complaint on June 2, 2000. (See Compl.) In its answer, defendant asserted that plaintiff failed to timely satisfy conditions precedent to suit under Title VII, the ADEA, and the Alabama ADEA, (see Answer ¶ 74), and specifically denied that plaintiff timely filed his charge with the EEOC within 180 days of learning of the alleged acts of discrimination of which he complains, (see Answer ¶ 9).

### IV. Applicable Substantive Law and Analysis

As noted earlier, plaintiff's complaint alleges that defendant is liable under the ADEA, Title VII, and Alabama's ADEA for allegedly terminating plaintiff because of his race and age. (See Compl. ¶¶ 1, 30-70.) Generally, defendant's motion for summary judgment asserts that plaintiff's complaint is due to be dismissed because no genuine issue of material fact exists and defendant is entitled to judgment as a matter of law. (See Def.'s Mot. Summ. J. at 1-2.) Specifically, defendant argues and

16

the undisputed facts demonstrate that plaintiff has failed to satisfy his burden of establishing that he timely filed a charge of discrimination with the EEOC within 180 days after the alleged unlawful conduct occurred.

Title VII and the ADEA require, as a condition precedent, that aggrieved persons file a charge of discrimination with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred."[12]  42 U.S.C. § 2000e-5(e); 29 U.S.C. § 626(d)(1).  Plaintiff must "generally allege in his complaint that 'all conditions precedent to the institution of the lawsuit have been fulfilled.'"  <u>Jackson v. Seaboard Coast Line R. Co.</u>, 678 F.2d 992, 1010 (11th Cir. 1982) (quoting Fed. R. Civ. P. 9(c)).  If the defendant doubts that plaintiff has fulfilled his conditions precedent in whole or in part, the defendant should deny "specifically and with particularity" that the plaintiff failed to meet the preconditions.  Fed. R. Civ. P. 9(c); <u>see</u> <u>Jackson</u>, 678 F.2d at 1010.  Once the defendant has

_____

   [12] The 180 day filing requirement is not jurisdictional and, thus, like a statute of limitations, it is subject to waiver, estoppel and equitable tolling.  <u>See Burnam v. Amoco Container Co.</u>, 755 F.2d 893, 894 (11th Cir. 1985); <u>Allison v. Western Union Telegraph Co.</u>, 680 F.2d 1318, 1323 (11th Cir.1982)(holding that the EEOC filing requirement under Title VII, like that under ADEA, is not jurisdictional).

17

contested plaintiff's filing of the charge of discrimination
within 180 days of the alleged unlawful conduct, the "plaintiff
then bears the burden of proving that the condition[] precedent .
. . h[as] been satisfied." Jackson, 678 F.2d at 1010.

    In determining when the 180-day limitation period begins to
run in a case of alleged discriminatory termination, the United
States Supreme Court generally has held that the date of the
notice of termination, not the actual date of termination itself,
is the operative date. See Delaware State College v. Ricks, 449
U.S. 250, 256-257 (1980); Chardon v. Fernandez, 454 U.S. 6, 8
(1981). "Mere continuity of employment, without more, is
insufficient to prolong the life of a cause of action for
employment discrimination." Ricks, 449 U.S. at 258. In Ricks,
plaintiff, an instructor at a state college, was denied tenure
and offered a one-year "terminal contract" after which
plaintiff's employment would be terminated. 449 U.S. at 252-255.
The Supreme Court determined that the plaintiff's EEOC charge was
not timely filed because plaintiff did not file his charge within
180 days from the time that plaintiff was notified of his
"terminal contract." See id. at 256-257. The court rejected
plaintiff's arguments that the applicable limitations period did
not begin to run until the actual expiration of his terminal
contract. See id. The Court noted that "[t]he limitations
period[], while guaranteeing the protection of the civil rights

laws to those who promptly assert their rights, also protect[s]
employers from the burden of defending claims arising from
employment decisions that are long past." <u>Ricks</u>, 449 U.S. at
256-257.

According to the Supreme Court, "[d]etermining the
timeliness of [plaintiff]'s EEOC complaint, and this ensuing
lawsuit, requires us to identify precisely the 'unlawful
employment practice' of which he complains." <u>Id.</u> at 255.  In
this case, plaintiff claims that discrimination motivated the
College's decision to terminate his employment. (<u>See</u> Pl.'s Mem.
Opp'n Summ. J. 14.)  Applying the general rule articulated by the
Court in <u>Ricks</u> to the facts in this case, the 180-day limitations
period commenced on the date of notice of plaintiff's
termination, April 27, 1998, and thus plaintiff's September 13,
1999 EEOC filing 503 days later was untimely.  Plaintiff
contends, however, that two possible exceptions to the general
rule, continuing violation and equitable tolling, should apply in
this case to extend the 180-day limitations period. (<u>See</u> Pl.'s
Mem. Opp'n Summ. J. 14-18.)  Because defendant raised the
timelineness issue, the burden shifts to plaintiff to prove that
the application of an equitable exception to the general rule is
justified in this case.  <u>See</u> <u>Jackson v. Seaboard Coat Line R.</u>
<u>Co.</u>, 678 F.2d 992, 1010 (11th Cir. 1982).

19

The Eleventh Circuit has recognized a "continuing violation" exception to the 180-day limitations period which arises when "a series of discrete acts of discrimination continues into the statutory filing period."[13] <u>Roberts v. Gadsden Memorial Hosp.</u>,835 F.2d 793, 799-800 (11th Cir. 1988), <u>amended on rehearing</u>, 850 F.2d 1549 (1988). On rehearing of <u>Roberts</u>, however, the Eleventh Circuit clarified that even if the discriminatory acts of defendant continued into the statutory filing period, plaintiff's claim is nonetheless time-barred if plaintiff was aware of his rights when the incidents occurred and thus could have asserted them at that time. <u>See</u> <u>Roberts</u>, 850 F.2d at 1550-1551. "The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse." <u>Roberts</u>, 835 F.2d at 800.

In this case, the undisputed evidence demonstrates that plaintiff thought, perhaps as early as the spring of 1998, that he had been discriminated against based on his age and race, (<u>see</u> Dep. of Charles Millar 53-54, 56-58, 102), and knew that there were laws prohibiting age and race discrimination in the workplace, (<u>see</u> <u>id.</u> 13-17). Plaintiff's knowledge of a potential

---

[13] When the exception applies, the EEOC complaint must be timely as to the last occurrence. <u>See</u> <u>Coon v. Georgia Pacific Corp.</u>, 829 F.2d 1563, 1570 (11th Cir. 1987.)

claim of discrimination when he was given notice of the
termination in April of 1998 bars the application of the
continuing violation exception.  See Roberts, 850 F.2d at 1550-
1551.  Furthermore, the various acts which plaintiff contends
constitute "continuous" discrimination[14] are not independent acts
of discrimination[15] and were not alleged in the EEOC charge.[16]
(See Ex. 20 to Dep. of Charles Millar.)  If anything, those
alleged acts serve as further evidence of plaintiff's knowledge,
at an early date, of a possible discrimination suit.

    Plaintiff alternatively argues that "equitable tolling"

---

[14] These charges include, but are not limited to, alleged
statements made by Dr. Mackin and Dr. McNealy, alleged denial of
audio-visual and computer equipment to plaintiff, and alleged
intentional avoidance of plaintiff by Dr. Mackin. (See Dep. of
Charles Millar 61, 64-66 110-113, 116-130.)  Although plaintiff
cannot specify the time frame for these incidents, he did testify
that they were before or during his last year of employment at
Stillman College.  (See id. at 61.)

[15] The allegations that defendant failed to provide
equipment to plaintiff and allegedly made discriminatory remarks
in the presence of plaintiff are certainly not "materially
adverse" employment actions which resulted in a "serious and
material change in the terms, conditions, or privileges of
plaintiff's employment" under the Eleventh Circuit standard for
adverse employment action discrimination claims.  See Davis v.
Town of Lake Park, 245 F.3d 1232, 1239 (11th Cir. 2001.)

[16] Although the breadth of the EEOC charge is to be
construed liberally, the scope of the civil action may be
permissibly limited "to the scope of the EEOC investigation which
can reasonably be expected to grow out of the charge of
discrimination."  See Sanchez v. Standard Brands, Inc., 431 F.2d
455, 466 (5th Cir. 1970).

should apply in this case to prevent the statute of limitations period from commencing until plaintiff knew or reasonably should have known that he was discriminated against.  See Carter v. West Publishing Co., 225 F.3d 1258, 1265 (11th Cir. 2000); Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 660-661 (11th Cir. 1993). "In order for equitable tolling to be justified in this case, the facts must show that, in the period more than 180 days prior to filing [his] complaint[] with the EEOC, [plaintiff] had no reason to believe that [he] w[as a] victim[] of unlawful discrimination." Ross, 980 F.2d at 660-661.  Equitable tolling will not apply where the plaintiff "suspects that he may have been discriminated against on account of age and is also generally aware of his legal right to obtain redress for that wrong." McClinton v. Alabama By-Products Corp., 743 F.2d 1483, 1487 (11th Cir.1984).  As noted above, plaintiff testified that as early as the spring of 1998, plaintiff was aware of federal statutes prohibiting age and race discrimination and suspected that the non-renewal of his employment contract was discriminatory, thus prohibiting the application of the equitable tolling exception.  (See Dep. of Charles Millar 13-17, 53-54, 56-58, 102.)

Seeing no exception that is appropriate in this case, the court finds that the general rule applies, and the filing

22

limitations periods therefore commenced at the time the non-renewal decision was made and communicated to plaintiff. "'The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful.' It is simply insufficient for [plaintiff] to allege that his termination 'gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination.'" Ricks, 449 U.S. at 258. (citations omitted). The EEOC charge was untimely filed beyond the 180-day limitations period and thus plaintiff has failed to satisfy the requisite conditions precedent to filing suit under Title VII and the ADEA.

In summary, the Court finds that no material issues of fact remain and that defendant Stillman College is entitled to judgment as a matter of law as to the federal claims asserted by the plaintiff under Title VII, 42 U.S.C. §§ 2000e, et. seq. and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, et. seq. A separate Final Judgment as to these claims will be entered. Pursuant to 28 U.S.C. § 1367(c)(3), the court will decline to exercise supplemental jurisdiction over the state law claim under the Alabama Age Discrimination in Employment Act, Ala. Code § 25-1-20, et. seq., and a separate order dismissing that claim will be entered.

23

DONE this __19th__ day of __July__ , 2001.


_____
SENIOR UNITED STATES DISTRICT JUDGE